COMMONWEALTH *vs.* BRIAN A. GEE.

No. 92-P-1855.

Plymouth. September 20, 1993. - March 2, 1994.

Present: PERRETTA, KASS, & PORADA, JJ.

*Identification. Evidence*, Photograph, Identification. *Practice, Criminal*, Instructions to jury.

At the trial of an indictment arising from the armed robbery of a restaurant, the judge erred in admitting in evidence an array of unsevered and unsanitized photographs (mug shots), including a photograph of the defendant, from which eyewitnesses to the crime had identified the defendant, where there was a basis in the record to question the adequacy of the opportunity provided the eyewitnesses to observe their assailant during the robbery, where the jury reasonably could have inferred from the photograph that the defendant had been involved in prior misconduct, and where limiting instructions by the judge to the jury were not adequate to cure the error. [157-158, 159-161]

At the trial of an armed robbery case, the defendant's objection to an array of unsevered and unsanitized photographs from which eyewitnesses to the crime had identified the defendant was sufficiently stated to preserve his right to challenge the admission of the photograph. [158-159]

INDICTMENT found and returned in the Superior Court Department on June 26, 1989.

The case was tried before *J. Harold Flannery*, J.

*Joseph J. Balliro* for the defendant.

*Robert C. Thompson*, Assistant District Attorney, for the Commonwealth.

PERRETTA, J. Two employees of Weylu's Restaurant in Brockton selected the defendant's picture from an array of twenty-two photographs as being the one depicting the robber who held them at gunpoint and stole the restaurant's money shortly after closing time on February 29, 1988. The unsevered and unsanitized photographs were admitted in evidence at the defendant's trial on an indictment charging him

with armed robbery. On appeal, the defendant claims that he is entitled to a new trial because the mug shots indicated to the jury that he had a prior criminal record. Concluding that the jury reasonably could have inferred from the photograph that the defendant had been involved in prior misconduct and that the limiting instruction to the jury was not adequate to cure the error, which could have influenced their verdict, we reverse the conviction.

1. *The robbery.* There was evidence to show that at about 1:00 A.M., on February 29, 1988, the assistant manager of the restaurant, Johnny Cheung, was in his car about to leave work for the night when he was accosted by four men, at least one of whom was Asian and had a gun. That man ordered Cheung out of the car and forced him, by holding the gun to his back, to return to the restaurant.

Michael Benjamin, the restaurant security officer, was sitting in the lobby when Cheung and the robbers entered. The robber holding the gun to Cheung's back, subsequently identified as the defendant, came from behind Cheung, went directly to Benjamin, and put a .45 caliber handgun to his forehead between his eyebrows. He warned Benjamin not to move or "he'd blow . . . [his] brains out." In the space of about three to five seconds, the defendant marched Benjamin to the rear of the restaurant where he removed Benjamin's revolver. The defendant next ordered Benjamin, the gun still to his back, to the kitchen where his hands were cuffed and his eyes taped. Cheung and the night manager, Ivan Ngan,[1] were also forced to the kitchen, handcuffed and blindfolded with tape.

When Benjamin no longer heard voices or sounds of activity, he worked to free himself of his handcuffs, and he called the Brockton police. That night, he described his assailant, the defendant, as Asian, about five feet, six or seven inches tall and of medium build, about one hundred and seventy pounds.

---

[1]Ngan did not testify as he was out of the country at the time of trial.

2. *The photographs.* John Martel testified that he was a detective with the Boston police department assigned, at the time of the robbery, to the "Asian task force." When the Brockton police department notified him of the robbery, he compiled a photographic array of twenty-two pictures of young Asian males. He brought the array to Benjamin and then to Cheung, each of whom selected the defendant's photograph.[2] When shown a photograph and asked whether he recognized it, Martel replied that he recognized the photograph because he knew the defendant, and he identified it as being the one selected by Benjamin and Cheung. He also stated that, although the male depicted in the photograph was not wearing glasses, "Brian wears glasses." He arrested the defendant who is five feet, eleven inches tall and weighed about one hundred and twenty pounds at the time of his arrest which was about three weeks after the robbery and after Benjamin and Cheung had been shown the array.

All the photographs were admitted in evidence over the defendant's objection. Each photograph, including that of the defendant, is a double-pose picture of an Asian male standing against a height chart. Each has a placard with an inscription, "POLICE DEPT., BOSTON, MASS," an identification number, and the date the photograph was taken. The height chart and placard appear in both poses of the photographs. At the time the photographs were admitted in evidence, defense counsel did not request a limiting instruction.[3]

3. *Identification of the defendant.* Benjamin testified that, during the three to five seconds he was in the lobby, he had the opportunity to see the defendant. Although there were discrepancies between the defendant's actual appearance and Benjamin's description of his assailant to the Brockton police, Benjamin did select the defendant's picture from the ar-

_____

[2]Defense counsel's objection to and motion to strike Martel's testimony concerning Cheung's selection of the defendant's photograph did not meet with success. After the Commonwealth rested without having called Cheung to testify, defense counsel again moved to strike Martel's testimony concerning Cheung's selection of the defendant's picture. The judge allowed the Commonwealth to reopen its case and call Cheung to testify.

[3]Appellate counsel was not trial counsel.

ray. He identified the defendant at hearings in the Brockton District Court as well as at trial. Benjamin observed that the only difference between the defendant's appearance in his picture and at all the court proceedings was that his photograph did not depict him wearing glasses.

Cheung's field of clear vision without his glasses is limited to about seven feet. He testified that although he had his glasses on when he was ordered from his car, he never got a good look at his assailant who thereafter remained behind him. He also stated that after the robbery, Martel showed him a large number of photographs of "criminals"[4] and told him "to pick out anyone that might look like who was in that incident, pick one out." Cheung picked out the picture of the defendant, whom he was unable to identify at the District Court proceedings. At trial, he did not say that the defendant was not the robber, but he could not tell the jury that he was. Additionally, Cheung believed his assailant had a facial birthmark whereas the defendant did not.

On this evidence, the judge told the jury, in his final instructions, "One or more of the exhibits in this case involves photographs that were in the possession of a police department. That is of no significance. Any police department may have lots of photographs for miscellaneous purposes. License issuance, for example. That has no significance and I instruct you to attach no significance to a police department's possession of a photograph of Mr. Gee in this case." Defense counsel objected to the instruction and requested that the jury be instructed in the language used in *Commonwealth* v. *Blaney*, 387 Mass. 628, 636 & n.7 (1982), but the judge denied the request.

4. *Discussion.* "Admission of a defendant's mug shots in evidence, laden, as it is, with potential for characterizing the defendant as a careerist in crime, is inhibited by three criteria: (1) the prosecution must show some need to introduce the mug shots; (2) the mug shots, to the extent possible,

---

[4]It is clear from the transcript that the Commonwealth neither intentionally solicited nor anticipated Cheung's characterization of the men in the pictures.

should not indicate a prior record; and (3) the mug shots should not call attention to their origins and implications." *Commonwealth* v. *Smith*, 29 Mass. App. Ct. 449, 451 (1990). See also *Commonwealth* v. *Payton*, 35 Mass. App. Ct. 586, 591-596 (1993). Where the sole issue at trial was the identification of the defendant, there can be little doubt as to the Commonwealth's need to use the photographs.

There also can be little doubt, however, because of the placards appearing in the photographs, that the police were in possession of the defendant's picture at a time, January 2, 1988, prior to the date of the offense, February 29, 1988, for which he was being tried. Moreover, Martel testified that the defendant was arrested after he had been identified from the array. See *Commonwealth* v. *Lockley*, 381 Mass. 156, 166 (1980); *Commonwealth* v. *Blaney*, 387 Mass. at 639. Compare *Commonwealth* v. *Payton*, 35 Mass. App. Ct. at 594-595.

The Commonwealth does not dispute the fact that, as stated in its brief, the "jury was exposed to evidence from which they could infer that the defendant had prior involvement with the Boston police." Instead, it argues that, because defense counsel limited his objection to the fact that the photographs were unsevered and voiced no complaint about their unsanitized condition, we should conclude that the unsanitized photographs did not create a substantial risk of a miscarriage of justice.

In objecting to the photographs, including that of the defendant, defense counsel stated: "They are front and side mug shot photos with some kind of shield under the face of each of the men depicted in the photos. So I am going to object to the photos or rather the form or having them be shown to the jury." When the judge asked whether the objection was based upon the police insignia, defense counsel responded, "Both as to the front and sides of the mug shots." Without inviting a reply from the Commonwealth or further discussion, the judge overruled the objection and instructed the prosecutor to "proceed."

If not a model of clarity, the objection was nonetheless adequate to alert the judge to the potential error so that it could have been avoided. See *Commonwealth* v. *Cancel,* 394 Mass. 567, 571-572 (1985), quoting from *Cady* v. *Norton,* 14 Pick. 236, 237 (1833). Compare *Commonwealth* v. *Payton,* 35 Mass. App. Ct. at 591-592 n.3, where, for "tactical reasons," no objection to the admission of the mug shots was lodged. We think the basis of the objection was sufficiently stated, especially when considered with the appearance of the photographs themselves and the misidentification theory of the defense, cf. *Commonwealth* v. *Cancel,* 394 Mass. at 573, quoting from McCormick, Evidence § 52, at 115 (2d ed. 1972), to entitle the defendant to the less stringent standard of review of the error. We come then to the real issue on appeal, that is, whether the error requires reversal of the defendant's conviction.

There was basis to question the adequacy of the opportunity provided Benjamin and Cheung to observe their assailant during the robbery. Benjamin's description of his assailant, given the same day as the crime, did not match the defendant's height or weight. Cheung, who thought his assailant had a facial birthmark, could not make an in-court identification of the defendant. In his final instructions, the judge essentially tracked the language in *Commonwealth* v. *Rodriguez,* 378 Mass. 296, 310-311 (1979), which includes consideration of the fact that "an identification made by picking the defendant out of a group of similar individuals is generally more reliable than one which results from the presentation of the defendant alone to the witness." *Id.* at 311. The strongest evidence against the defendant was the fact that both Benjamin and Cheung selected his picture from the same array of photographs, a point brought home by the prosecutor when, in her closing argument she asked the jury to ponder the "odds on that."

Focus on the defendant's photograph invites attention to his prior involvement with the Boston police. It is the Commonwealth's position that the judge's "cautionary remarks," that the jury was to attach no significance to the fact that

the defendant's photograph was in the possession of the police, "mirror in every significant respect those approved by the Court" in *Commonwealth* v. *Blaney*, 387 Mass. at 636 n.7: "You cannot draw any inference against [the defendant] . . . if you infer then that the police . . . at that time had a photograph of [the defendant]. You can't draw any inferences against him simply because the police had his photograph. The police departments have pictures of people for many different reasons, and you cannot speculate on the fact, if you came to believe it was a fact, that they had a picture of [the defendant]." See also *Commonwealth* v. *Banks*, 27 Mass. App. Ct. 1193, 1194 (1989); *Commonwealth* v. *Payton*, 35 Mass. App. Ct. at 595.

In both *Blaney* and *Banks*, the instructions given concerned photographs that had been sanitized prior to their admission in evidence.[5] The point of those instructions was that, because the police have pictures of people for a variety of reasons, the adverse inference that the photos are mug shots from a prior criminal episode was not to be drawn. In the present case, Martel's testimony dispelled any unrealistic notion that the defendant's unsanitized, double-pose photograph could have been taken for an innocuous reason. The instruction lacked the force necessary to reach its mark, and we are left to wonder whether the jury understood that they could draw no inference adverse to the defendant from the apparent fact that the photographs are mug shots taken prior to his arrest for the offense for which he was on trial.

We are unable to conclude that the condition of the photographs "did not influence the jury, or had but very slight effect." *Commonwealth* v. *Gilday*, 382 Mass. 166, 178 (1980),

---

[5]In *Commonwealth* v. *Payton*, 35 Mass. App. Ct. at 592, no objection was taken to the photographs because, as earlier noted, it was "trial counsel's strategy . . . to attack the photographic identifications by showing that the array was so suggestive as to lead the identifying witnesses to make faulty identifications." Nonetheless, the judge instructed the jury "not to draw any inference against this defendant because the police have his photograph" and that "[t]he fact that the police may have this defendant's picture does not mean the defendant committed this or any crime." *Id.* at 595.

quoting from *United States* v. *Agurs,* 427 U.S. 97, 112 (1976). See also *Commonwealth* v. *Peruzzi,* 15 Mass. App. Ct. 437, 445-446 (1983), quoting from *Kotteakos* v. *United States,* 328 U.S. 750, 764-765 (1946). On the Commonwealth's evidence, any reasonable doubt by the jury about the ability of Benjamin and Cheung to identify the defendant as one of their assailants might have been resolved upon the basis of his prior involvement with the Boston police. We leave to the discretion of the trial judge at retrial whether, in addition to being sanitized, the photographs should be severed.[6]

> *Judgment reversed.*
> *Verdict set aside.*

---

[6]We do not agree with the defendant's remaining claim that the prosecutor inflamed the jury with her closing remarks concerning Benjamin's terror when the gun was put to his forehead. Those statements were directed to the defendant's argument that Benjamin was so frightened and his attention so riveted on the gun that he had no true ability to observe his assailant.