## COMMONWEALTH vs. THOMAS H. AUSTIN.

Bristol. May 1, 1995. - November 15, 1995.

Present: LIACOS, C.J., WILKINS, ABRAMS, LYNCH, O'CONNOR, & GREANEY, JJ.

*Identification. Practice, Criminal,* Motion to suppress. *Due Process of Law,* Identification. *Evidence,* Photograph, Videotape.

In a criminal case, police officers' use of an identification procedure wherein two witnesses viewed a surveillance videotape of an unrelated bank robbery from which they identified the defendant was not unnecessarily suggestive in circumstances in which there was a serious risk to public safety posed by a series of crimes having a similar modus operandi and in which the witnesses appeared exceptionally nonsuggestible: the judge did not err in denying the defendant's motion to suppress those identifications. [361-364] O'CONNOR, J., dissenting, with whom LIACOS, C.J., joined.

At the trial of an indictment for armed assault with intent to rob arising from an attempted bank robbery, the judge properly, in his discretion, admitted in evidence a surveillance videotape of an unrelated bank robbery for the limited purpose of assisting the jury in assessing the reliability of two witnesses' identifications of the defendant as the person depicted in the videotape. [364-365] O'CONNOR, J., dissenting, with whom LIACOS, C.J., joined.

At a criminal trial, the judge incorrectly allowed in evidence nonexpert opinion testimony that the man shown on a videotape was the defendant: where the evidence was merely cumulative of other properly admitted identification evidence and the case against the defendant was strong, admission of this testimony did not constitute reversible error. [365-366]

INDICTMENT found and returned in the Superior Court Department on January 16, 1991.

A pretrial motion to suppress evidence was heard by *Walter E. Steele,* J., and the case was tried before him.

The Supreme Judicial Court granted an application for direct appellate review.

*Brownlow M. Speer*, Committee for Public Counsel Services, for the defendant.

*Elspeth B. Cypher*, Assistant District Attorney, for the Commonwealth.

GREANEY, J. A jury in the Superior Court convicted the defendant on an indictment charging him with armed assault with intent to rob. He was acquitted on an indictment charging him with armed assault with intent to murder. The defendant appealed. We granted his application for direct appellate review. He argues three claims of error. First, the defendant contends that his pretrial motion to suppress out-of-court identifications made by two eyewitnesses was improperly denied. Second, he argues that the trial judge erred in admitting in evidence a surveillance videotape of another robbery, allegedly committed by the defendant. Third, the defendant argues that the judge erred in permitting a Commonwealth witness, Hubert Paquette, a police officer in Rhode Island, to testify that he knew the defendant, and that he recognized the individual on the surveillance videotape as the defendant. We conclude that the out-of-court identifications were admitted properly, and that the surveillance videotape was admissible for the purpose of assisting the jury in evaluating the reliability of the challenged identifications. We further conclude that the testimony of Hubert Paquette should not have been admitted, but that its admission was not prejudicial. Accordingly, we affirm the defendant's conviction.

1. *Identification evidence.* We recite the relevant facts found by the judge on the defendant's motion to suppress, with minor additions from the transcript. On February 20, 1990, an armed man entered the First Federal Savings Bank in Somerset and attempted to rob it. Laurie Gervasio[1] and Jeanie Mizher, employees of the bank, witnessed the attempted robbery. They described the gunman as approxi-

---

[1]At the time of the attempted robbery, Laurie Gervasio was known as Laurie Houde. There is some discrepancy in the record as to the spelling of her first name. We shall refer to her simply as Gervasio.

mately six feet tall, slender, fair skinned, wearing a knit cap
and a tan or gold overcoat. They described his face as long
and thin and stated that he had an extremely large nose and
very distinctive nervous mannerisms. The man fled the bank
after seeing a police officer through the bank window. The
officer pursued the robber, who fired shots at his pursuer at
least twice. Several minutes later, while making his escape in
a waiting vehicle, the robber also fired his gun at some
bystanders.

Gervasio testified that the robber walked within three feet
of her desk as he approached the teller. She had a clear view
of him and observed him throughout the robbery. Mizher
also had an unobstructed view of the robber. Her attention
was drawn to him when he yelled instructions to the teller.
Mizher watched him until he left the bank, approximately
three minutes later.

After the robbery, Gervasio went to the East Providence
police station to view two lineups of eight men each. She did
not see the robber among these individuals. She then went to
the Somerset police station and assisted an officer in making
a composite drawing of the robber. The day following the
attempted robbery, Mizher and Gervasio separately viewed
about 200 color photographs. Neither witness selected a pho-
tograph from this array. Both women stated that they were
positive they could identify the robber if they saw him again.

Two days later, on February 23, the two women were
shown another photographic array consisting of eight photo-
graphs. Neither identified the robber from this array. How-
ever, Mizher selected a photograph from this array as a pic-
ture which might give the police some idea of the robber's
appearance. She was sure the person depicted in this photo-
graph was not the robber.[2]

On February 23, there was an armed bank robbery in
Rhode Island. The robber was not apprehended, but the rob-
bery was recorded by the bank's surveillance camera. The

[2]The defendant's photograph was not included in either of these arrays,
nor was he present in the lineups.

police watched the videotape of the robbery and noticed that the individual on the videotape (Rhode Island robber) resembled Gervasio's composite drawing of the Somerset robber. The mannerisms displayed by the Rhode Island robber, and the similar modus operandi, led the police to believe that the two banks had been robbed by the same individual. Also on February 23, a Somerset detective learned from a colleague of a recent armed bank robbery in Salem, New Hampshire, having characteristics similar to the Somerset and Rhode Island robberies.

On February 24, the police showed the videotape to Gervasio. She was warned to remain unbiased as she watched it. Within seconds of observing the man on the videotape, Gervasio stated that he was the man who robbed the Somerset bank. The police later showed the videotape to Mizher who also identified the man, without hesitation, as the Somerset bank robber.

On February 26, the East Providence police department began showing the surveillance videotape to its officers as they came on duty. Two police officers who were former correction officers recognized the man in the videotape as Thomas Austin, who had previously been incarcerated. The police obtained two photographs of the defendant and placed one of them in a photographic array consisting of twelve photographs. This array was shown to both witnesses. Mizher chose the defendant's photograph immediately. Gervasio stated that the defendant's photograph resembled the robber but that the man in the photograph had skin that was darker than the robber's skin. An officer then showed the second photograph of the defendant to Gervasio. This photograph was of a better quality and depicted the defendant with a lighter complexion. Gervasio identified him as the Somerset robber.

The defendant was arrested, pursuant to a warrant, and placed in a lineup with four other men. Gervasio and Mizher

viewed the lineup separately and both immediately identified the defendant as the man who robbed the Somerset bank.[3]

2. The defendant argues that the judge erred in denying his motion to suppress the identifications made by Gervasio and Mizher when they viewed the videotape. He claims the identification procedure was unnecessarily suggestive in violation of his due process rights under art. 12 of the Declaration of Rights of the Massachusetts Constitution. See *Commonwealth* v. *Johnson*, 420 Mass. 458 (1995) (if defendant satisfies burden of demonstrating that witness was subjected to unnecessarily suggestive identification procedure, prosecution is barred from introducing that confrontation in evidence at trial). After a hearing, and based on the facts set forth above, the judge concluded that the out-of-court identifications were admissible because the witnesses were "reliable" and thus there was no "substantial likelihood of irreparable misidentification." The identification procedure using the surveillance videotape was similar to a one-on-one confrontation between the suspect and witnesses Gervasio and Mizher. Such showup identifications are disfavored because they are viewed as inherently suggestive. See *Commonwealth* v. *Johnson, supra* at 461; *Commonwealth* v. *Santos*, 402 Mass. 775, 781 (1988). See also *Stovall* v. *Denno*, 388 U.S. 293, 301-302 (1967). Nonetheless, a one-on-one pretrial identification raises no due process concerns unless it is determined to be *unnecessarily* suggestive. Whether an identification procedure is "unnecessarily" or "impermissibly" suggestive, see *Commonwealth* v. *Thornley*, 406 Mass. 96, 98-99 (1989), involves inquiry whether good reason exists for the police to use a one-on-one identification procedure, see 1 W.R. LaFave & J.H. Israel, Criminal Procedure § 7.4 (b), at 581 (1984), bearing in mind that this court has said that "[e]xigent or special circumstances are not a prerequisite to such confrontations." *Commonwealth* v. *Harris*, 395 Mass. 296, 299 (1985). See *Commonwealth* v. *Barnett*, 371 Mass.

---

[3]The defendant does not argue that either the photographic array or the lineup from which he was identified was suggestive.

87, 92 (1976), cert. denied, 429 U.S. 1049 (1977); *Commonwealth* v. *Coy*, 10 Mass. App. Ct. 367, 371 (1980).

Relevant to the good reason examination are the nature of the crime involved and corresponding concerns for public safety; the need for efficient police investigation in the immediate aftermath of a crime; and the usefulness of prompt confirmation of the accuracy of investigatory information, which, if in error, will release the police quickly to follow another track. *Commonwealth* v. *Barnett, supra.* The analysis cannot be generalized. Each case must be resolved on its own peculiar facts, considering as well that the existence of "good reason" presents a question of law for the appellate court to resolve on the facts found by the motion judge. See *Commonwealth* v. *Colon-Cruz*, 408 Mass. 533, 538-539 (1990); *Commonwealth* v. *Barnett, supra* at 91.

The police had extremely good justification in this case for not resorting to a different identification procedure. Three armed bank robberies (in New Hampshire, Massachusetts, and Rhode Island) had occurred within a few days of each other. Two percipient bank managers had confronted the Somerset robber, and these witnesses had examined over 200 photographs and failed to make an identification. The witnesses were certain, however, that they could identify the Somerset robber if they saw him again, and one of them had assisted in the preparation of a composite drawing of the criminal. The police could take into consideration that the percipient witnesses appeared unusually reliable and nonsuggestible.

The Rhode Island and New Hampshire robberies bore a high degree of similarity to the modus operandi of the Somerset robbery, and the man who appeared in the videotape of the Rhode Island robbery resembled the man depicted in the composite drawing. The police were keenly aware that at least one dangerous bank robber was at large, and that whoever was involved could either escape altogether or strike

again with possible injury to, or loss of, human life.[4] The police acted responsibly in concluding that a prompt viewing by the witnesses of the surveillance tape from the Rhode Island robbery was needed. Specifically, the police needed to determine, as quickly as possible, whether the robberies were committed by a single individual. Based on the identification by the witnesses (or the lack thereof), the police in these communities would know whether they were dealing with one bank robber or more, and could focus their investigation accordingly. If the witnesses identified the man in the videotape as the Somerset robber, the Somerset police would have access to a photographic representation of the man, in addition to the composite drawing on which they were relying.

The defendant does not suggest that an alternate identification procedure was available and should have been employed. He argues instead that the police should have forgone attempting to establish a connection between these three crimes until such time as the perpetrator of the Rhode Island robbery had been identified or apprehended, opening the possibility of identification by lineup or traditional photographic array. This suggestion appears feasible only in hindsight. At the time the videotape was shown to Gervasio and Mizher, the police could not have known that the man in the videotape would be recognized promptly by members of the East Providence police department. Facing robberies in three States, the police departments involved could not make effective determinations on how to proceed in attempting to locate what might have been several perpetrators.

The identification made from the surveillance videotape confirmed that one man had robbed the Somerset and Rhode Island banks, and strengthened the inference that he had also

---

[4]At the hearing on the defendant's motion to suppress, a Somerset police officer testified to the urgency and concern felt by the police department:

"I was concerned there was a guy that fired shots at police and at citizens that was holding up banks. The [modus operandi] fit the description of bank robberies throughout the area, as far away as Salem, New Hampshire; and we believed we had a guy out there that was going to rob a bank a day until somebody was killed."

been responsible for the New Hampshire robbery. That valuable information in turn led to the identity of a suspect in the Somerset robbery and caused the police promptly to arrange further pretrial identifications by the witnesses of the defendant through a photographic array and a lineup which are not challenged as improper in any respect. We conclude that, in the circumstances, which included a serious risk to public safety posed by a series of crimes having a similar modus operandi and eyewitnesses who appeared exceptionally non-suggestible, the police had good reason for what they did, and the surveillance videotape identification was not, as a result, unnecessarily suggestive.

3. The defendant also argues that the judge erred in admitting the videotape of the Rhode Island robbery because it constituted prejudicial evidence of other bad acts. While the point is close, we think the admission of the videotape was within the scope of the judge's discretion. See *Commonwealth* v. *Jackson*, 384 Mass. 572, 578-579 (1981). The videotape was admitted for the limited purpose of assisting the jury in assessing the reliability of the witnesses' identification of the defendant as the person depicted in the videotape. Thus, it was admitted on the same basis and for precisely the same purpose as were the photograph of the defendant in the lineup and the photographic arrays shown to the witnesses at the various stages of the police investigation. Testimony connected with the admission of the videotape focused exclusively on the degree of certainty exhibited by the witnesses in their identification of the man depicted in the videotape as the Somerset robber. Admission at trial of the photographs which formed the basis of a witness's out-of-court identification of the defendant is relatively routine. See K.B. Smith, Criminal Practice and Procedure §§ 466-468 (1983 & Supp. 1995). As the Appeals Court observed in a similar case, "the [identification procedures] were the major investigatory tool which fixed suspicion on the defendant, and both prosecution and defense had an interest in arguing whether a positive identification of the defendant on the basis

of the [photographic representations] was plausible." *Commonwealth* v. *Smith*, 29 Mass. App. Ct. 449, 452 (1990).

The videotape, however, was not amenable to the sanitization procedures on which this court has insisted when a photographic array shown to a jury consists of police "mug shots." See, e.g., *Commonwealth* v. *Blaney*, 387 Mass. 628, 637-640 (1982); *Commonwealth* v. *Smith*, *supra* at 452-453. We would be reluctant to conclude that it was, for that reason, categorically inadmissible. It is, in our opinion, analogous to the newspaper articles admitted for explanatory or foundation purposes in the case of *Commonwealth* v. *Jackson*, 384 Mass. 572, 578-579 & n.2 (1981), even though those articles strongly suggested that the defendant had committed murders other than the one for which he was being tried. As was done in the *Jackson* case, the judge here gave strong curative instructions to the jury at several points in the trial regarding the nature of the videotape and its limited use. We assume that the jury listened to and followed these instructions. See *Commonwealth* v. *Gallagher*, 408 Mass. 510, 518 (1990). There was no error.[5]

4. We agree with the defendant that the nonexpert opinion testimony of Hubert Paquette should not have been admitted. Paquette, whose testimony was of brief duration, stated that he had been acquainted with the defendant since 1977, saw him on a daily basis between 1978 and 1980, and periodically between 1980 and 1983.[6] He then testified that he had

---

[5]The defendant argues that the videotape did not meet the standard for admissibility of "other bad acts" evidence set out in *Commonwealth* v. *Jackson*, 417 Mass. 830, 836 (1994). That case was concerned with the admission of evidence of a bad act other than the one for which the defendant was on trial used as proof of the identity of the perpetrator of both acts because of the unusual and highly distinctive way in which the acts were committed. Here, the videotape was admitted for a different (and a more limited) purpose. The decision in the *Jackson* case relied on by the defendant is not on point.

[6]Paquette was a police officer in Rhode Island and had previously been a guard at the prison where the defendant had been incarcerated. His testimony brought neither of these facts to the attention of the jury.

viewed the surveillance videotape, and that he determined the man in the videotape to be the defendant.

"The competency of . . . [the opinion evidence of a nonexpert] rests upon two necessary conditions: first, that the subject matter to which the testimony relates cannot be reproduced or described to the jury precisely as it appeared to the witness at the time; and second, that the facts upon which the witness is called to express his opinion, are such as men in general are capable of comprehending and understanding." *Commonwealth* v. *Nassar*, 351 Mass. 37, 41-42 (1966), quoting *Commonwealth* v. *Sturtivant*, 117 Mass. 122, 137 (1875). For the purpose for which the videotape was admitted in evidence, the opinion of Paquette that the defendant was the man in the videotape was inadmissible. The jury were capable of viewing the videotape and drawing their own conclusions regarding whether the man in the videotape was the defendant without the assistance of Officer Paquette's testimony. Cf. *Commonwealth* v. *Vitello*, 376 Mass. 426, 459-460 & n.29 (1978) (following *Nassar* but holding that officer could properly testify that photograph chosen by witness depicted defendant because defendant's appearance had changed since time of robbery). See also *United States* v. *Jackman*, 48 F.3d 1, 4-5 (1st Cir. 1995) (holding admissible nonexpert opinion testimony identifying a defendant from a surveillance photograph "when the witness possesses sufficiently relevant familiarity with the defendant that the jury cannot also possess, and when the photographs are not either so unmistakably clear or so hopelessly obscure that the witness is no better-suited than the jury to make the identification").

Admission of this testimony did not constitute reversible error. The evidence pointing to the defendant was overwhelming and the officer's testimony was merely cumulative of other identification evidence properly admitted against the defendant. See *Commonwealth* v. *Nassar, supra* at 42; *Commonwealth* v. *Anderson*, 19 Mass. App. Ct. 968, 969 (1985).

*Judgment affirmed.*

O'CONNOR, J. (dissenting, with whom Liacos, C.J., joins). The judge erred by denying the defendant's motion to suppress the identifications made by Gervasio and Mizher when they viewed the videotape. The court states, "The identification procedure using the surveillance videotape was similar to a one-on-one confrontation between the suspect and witnesses Gervasio and Mizher. Such showup identifications are disfavored because they are viewed as inherently suggestive." *Ante* at 361. Indeed, as the court says, one-on-one confrontations are inherently suggestive, but their suggestiveness pales in comparison to the suggestiveness in this case in which the police showed the witnesses to a bank robbery a videotape of the suspect in the act of robbing a bank. The message to the witnesses was not only the usual message presented by a one-on-one showup, which is that the police had reason to believe that the man being shown to the witnesses was the man who had committed the crime they had witnessed. Here, the additional powerful message to the witnesses to a recent bank robbery was that the police were undoubtedly right because the man being shown to them was unquestionably a bank robber; if he would rob one bank, he would rob other banks. It is impossible to imagine a more suggestive "confrontation" than the one that occurred in this case, and that suggestiveness was not diminished one iota by the witnesses' opportunities to observe the robber of the Somerset bank. *Commonwealth* v. *Thornley*, 406 Mass. 96, 98-99 n.3 (1989) ("the judge examines only the totality of the circumstances of the particular confrontation or identification itself and does not consider 'the witness's entire connection with the case to determine whether the confrontation, although . . . unnecessarily suggestive, was nevertheless reliable, and therefore usable. . . .' [*Commonwealth* v. *Botello*, 369 Mass. 860, 867 (1976)]. Here, for example, that the three witnesses had ample opportunity to view the two men at the bar on the night in question has no bearing on the suggestiveness of the photographic array. See *id.*").

Basic fairness requires that, in considering the admissibility in this case of the videotape identification, the court rec-

ognize not only that the procedure was suggestive but also that the suggestiveness was enormous. "[T]he dangers present whenever eyewitness evidence is introduced against an accused require the utmost protection against mistaken identifications. There is no question that the danger of mistaken identification by a victim or a witness poses a real threat to the truth-finding process of criminal trials. Indeed, mistaken identification is believed widely to be the primary cause of erroneous convictions. . . . We have stated that '[t]he law has not taken the position that a jury can be relied on to discount the value of an identification by a proper appraisal of the unsatisfactory circumstances in which it may have been made. On the contrary, this court, like others, has read the Constitution to require that where the conditions are shown to have been highly and unnecessarily suggestive, the identification should not be brought to the attention of the jury.' *Commonwealth* v. *Marini*, 375 Mass. 510, 519 (1978)." (Citations omitted.) *Commonwealth* v. *Johnson*, 420 Mass. 458, 465 (1995).

The question before the court, I suggest, is not "whether good reason exists for the police to use a one-on-one identification procedure" as the court, without citation of case authority, suggests. *Ante* at 361. The question is whether the videotape identification procedure was "so impermissibly or unnecessarily suggestive and conducive to irreparable misidentification as to deprive the defendant of his due process rights." *Commonwealth* v. *Thornley*, *supra* at 98-99. If it was, evidence of the identification such procedure produced was not admissible. The identification procedure in question here was suggestive to a far greater degree than the usual one-on-one showup procedure. The procedure was infinitely more suggestive than in any case on which the court relies or of which I am aware. It cannot be said with confidence that the procedure was not "conducive to irreparable misidentification." To the contrary, the procedure invited irreparable misidentification. Therefore, the videotape identification evidence should have been excluded. It should have been ex-

cluded even if one were to concede, which I do not,[1] that the procedure, which apparently was designed only to determine whether the police should look for one bank robber or two, qualifies as having been "necessary" or based on "good reason." The admission of the videotape identification evidence was erroneous and the error cannot properly be viewed as harmless. Therefore, the conviction should be reversed.

The conviction also should be reversed because, over the defendant's objection, the videotape itself was admitted in evidence. The jury not only heard that a few days after the Somerset robbery Gervasio and Mizher identified as the Somerset bank robber the individual shown on the Rhode Island videotape, but also the jury were allowed to view the videotape. The videotape that was conducive to irreparable misidentification by the witnesses also was made available for reasonably likely misuse by the jury as I shall discuss below. Admission of the videotape was therefore improper and cannot be characterized as harmless error.

"The general rule is that evidence that the defendant committed similar but unconnected crimes against different victims is inadmissible. *Commonwealth* v. *Welcome*, 348 Mass. 68, 70 (1964). *Commonwealth* v. *Stone*, 321 Mass. 471, 473-474 (1947). . . . Although this court may have been more willing recently than in prior years to allow evidence of bad acts to be admitted to prove an element of a crime (see, e.g., *Commonwealth* v. *Helfant*, 398 Mass. 214, 226-228 [1986]; *Commonwealth* v. *King*, 387 Mass. 464, 472 [1982]), we have not relaxed our standards where the Commonwealth offers evidence of [other] bad acts to prove the identity of the person who committed the crime. We have held that evidence of [other] bad acts is not admissible to prove identity unless there is a special mark or distinctiveness in the way the acts were committed (i.e., in the modus operandi). See *Commonwealth* v. *Lacy*, 371 Mass. 363, 366 (1976). See also

---

[1] The need for such information falls far short of the circumstances referenced in our cases as demonstrating necessity. See *Commonwealth* v. *Harris*, 395 Mass. 296, 299 (1985); *Commonwealth* v. *Barnett*, 371 Mass. 87, 92-93 (1976), cert. denied, 429 U.S. 1049 (1977).

*Commonwealth* v. *Helfant, supra* at 235 (O'Connor, J., dissenting). . . .

"The admission of evidence that the defendant had previously [or subsequently] committed the same kind of crime obviously could have an improper influence on the jury's fact-finding function. Thus, it is most important that the Commonwealth demonstrate that the prior events and the circumstances of the crime charged have such similarities as to be meaningfully distinctive. See *Commonwealth* v. *Lacy*, 371 Mass. 363, 366 (1976); *Commonwealth* v. *Madyun*, 17 Mass. App. Ct. 965, 966 (1983). See also *Commonwealth* v. *Helfant*, 398 Mass. 214, 235 (1986) (O'Connor, J., dissenting) ('Modus operandi evidence is designed to identify the perpetrator of a crime proven by other evidence'). There must be a uniqueness of technique, a distinctiveness, or a particularly distinguishing pattern of conduct common to the current and [subsequent] incidents to warrant the admission of evidence of prior bad acts as tending to prove that the defendant was the person who committed the crime charged." *Commonwealth* v. *Brusgulis*, 406 Mass. 501, 504-506 (1990). See also *Commonwealth* v. *Jackson*, 417 Mass. 830, 835-837 (1994).

The court, entirely correctly, does not suggest that the videotape depicting the defendant robbing the Rhode Island bank was admissible to prove that the defendant was the Somerset bank robber because the evidence demonstrated a uniqueness — a special mark of distinctiveness — in the way the robberies were committed (modus operandi). In this case, the Commonwealth has not shown a "uniqueness of technique, a distinctiveness, or a particularly distinguishing pattern of conduct common to the [two] incidents." *Commonwealth* v. *Brusgulis, supra* at 506.

The court offers two justifications for its conclusion that "admission of the videotape was within the scope of the judge's discretion." *Ante* at 364. The first asserted justification is that "[t]he videotape was admitted for the limited purpose of assisting the jury in assessing the reliability of the witnesses' identification of the defendant as the person de-

picted in the videotape. Thus, it was admitted on the same basis and for precisely the same purpose as were the photograph of the defendant in the lineup and the photographic arrays shown to the witnesses at the various stages of the police investigation." *Ante* at 364. I reject that reasoning because I do not agree that the witnesses' videotape identification evidence was properly admitted. It follows that I do not agree that the videotape was admissible to assist the jury in assessing evidence that was improperly before them.

I have one further comment on the court's first asserted justification for its acceptance of the admission of the videotape as being within the scope of the judge's discretion. It is true that when a witness makes an out-of-court identification of a defendant from a fair, nonsuggestive array of photographs or from a lineup, the array or a photograph of the lineup is frequently offered by the Commonwealth and admitted in evidence to prove the reliability of the identification as the product of a fair, nonsuggestive, procedure. It is very difficult to believe, however, that in this case the extraordinarily suggestive videotape was offered in evidence to demonstrate that Gervasio and Mizher's videotape identification was reliable because it was the product of a nonsuggestive procedure. I shall not speculate on what the prosecutor's motive was in offering the videotape. It is only important that its admission was unfair and inconsistent with our case law.

The court's second explanation of its conclusion that admission of the videotape in evidence was not erroneous is that the videotape was "analogous to the newspaper articles admitted for explanatory or foundation purposes in the case of *Commonwealth* v. *Jackson*, 384 Mass. 572, 578-579 & n.2 (1981)." *Ante* at 365. I respectfully demur to the equating of the present case with *Jackson*. In *Jackson*, which was a murder case, the defendant's longtime friend testified over the defendant's objection that he had visited the defendant in jail and discussed with the defendant "two newspaper articles concerning an investigation into the murders of six young women, one of whom was the victim, Reich. Those articles referred to a murder in New Hampshire, and [the witness]

testified that the defendant voluntarily told him that 'the one in New Hampshire was not [the defendant's].' The two newspaper articles, with some portions excised, were admitted in evidence." *Id.* at 577.

In *Jackson*, the defendant argued that the evidence described above was erroneously admitted because, as other crime evidence, it created "a serious danger that the jury's decision was based on the defendant's criminal propensity rather than on the evidence." *Id.* In rejecting the defendant's argument, the court reasoned that "because the defendant, in his admission of the crime charged, admitted to other, unrelated crimes in a manner that rendered the admission unintelligible if references to the unrelated crimes were omitted, the entire admission was properly admitted in evidence." *Id.* at 578. The other crime evidence in *Jackson* was admissible because it was critical to an understanding of the defendant's statement that "the one in New Hampshire was not [the defendant's]." The newspaper articles provided the context in which the defendant's words were uttered and made clear that, by those words, he was admitting the crime with which he was charged.

In contrast to *Jackson*, the other crime evidence in this case explained nothing significant or appropriate to the jury's verdict. It brought nothing to the case that was relevant. Instead, the dramatic presentation to the jury of the videotape depicting the defendant carrying out the bank robbery in Rhode Island three days after the Somerset bank robbery occurred could have done nothing more nor less than leave the jury with the impression that the defendant was a bad man with a propensity to rob banks and therefore was likely to have committed the robbery with which he was charged. The danger, of course, is that, while such evidence may be marginally probative (much less so than legitimate modus operandi evidence), the jury were "led to dispense with proof beyond a reasonable doubt that [the defendant] did actually commit the crime charged." *Commonwealth* v. *Stone*, 321 Mass. 471, 473 (1947). See McCormick, Evidence § 188 (3d ed. 1984).

I would reverse the conviction and order a new trial for two reasons: (1) The trial judge erred in admitting in evidence the two videotape identifications of the defendant as the robber of the Somerset bank; (2) the judge erred in admitting the videotape itself contrary to the salutary rule of fairness declared in *Commonwealth* v. *Stone, supra.*