The slip opinion is the first version of an opinion released by the Chief Clerk of the Supreme Court. Once an opinion is selected for publication by the Court, it is assigned a vendor-neutral citation by the Chief Clerk for compliance with Rule 23-112 NMRA, authenticated and formally published. The slip opinion may contain deviations from the formal authenticated opinion.

**IN THE SUPREME COURT OF THE STATE OF NEW MEXICO**

Opinion Number:

Filing Date: April 28, 2025

**NO. S-1-SC-40221**

**STATE OF NEW MEXICO,**

     Plaintiff-Appellee,

v.

**JESUS GARCIA,**

     Defendant-Appellant.

**APPEAL FROM THE DISTRICT COURT OF VALENCIA COUNTY**
**Cindy M. Mercer, District Judge**

Bennett J. Baur, Chief Public Defender
Allison H. Jaramillo, Assistant Appellate Defender
Santa Fe, NM

for Appellant

Raúl Torrez, Attorney General
Emily Miller, Assistant Attorney General
Albuquerque, NM

for Appellee

**CONSOLIDATED WITH**

**NO. S-1-SC-40225**

**STATE OF NEW MEXICO,**

Plaintiff-Appellee,

v.

**ALEXANDRO MONTELONGO-MURILLO,**

Defendant-Appellant.

**APPEAL FROM THE DISTRICT COURT OF VALENCIA COUNTY**
**Cindy M. Mercer, District Judge**

Harrison & Hart, LLC
Nicholas T. Hart
Albuquerque, NM

for Appellant

Raúl Torrez, Attorney General
Teresa M. Ryan, Assistant Solicitor General
Santa Fe, NM

for Appellee

**OPINION**

**VARGAS, Justice.**

{1}	In a joint trial, Defendants Jesus Garcia and Alexandro Montelongo-Murillo (together Codefendants) were convicted of first-degree murder and other crimes arising from a deadly drive-by shooting. Prior to trial, the district court excluded the testimony of an eyewitness who would have testified that he saw another person commit the crime. Even though this eyewitness was on the State's witness list from the beginning of the case and the prosecutor interviewed him pretrial, the district court excluded his testimony under Rule 5-502 NMRA for the sole reason that the defense had not specifically listed his name and address on the defense witness list. On appeal, only Defendant Garcia properly challenged the exclusion of this eyewitness. But because this issue affected the fundamental rights of both Codefendants, we consolidated their appeals and reach the issue sua sponte in the case of Defendant Montelongo-Murillo.

{2}	We hold that the exclusion of the eyewitness deprived both Codefendants of their constitutional right to present a defense. Accordingly, we reverse and remand for a new trial.

{3}	Having granted a new trial, we do not reach the other issues raised on appeal save for the admissibility of a separate eyewitness identification that Codefendants

claim was impermissibly suggestive pursuant to *State v. Martinez*, 2021-NMSC-002, 478 P.3d 880. We hold that *Martinez* does not require suppression of that eyewitness identification and therefore the district court did not err in denying Codefendants' motion to suppress.

## I. BACKGROUND

**A. The Crime**

{4} Daniel and Scott Sandoval, two brothers, were at home in Meadow Lake, New Mexico when Daniel saw an SUV approaching. Frightened, Daniel told Scott, "We got to go. We got to go." As the SUV came to a stop behind Daniel's white Buick, Daniel and Scott "dived into the car" and sped away. Before getting in the car, Scott saw the driver and passenger of the SUV for "just a few seconds." The SUV pursued them, and the occupants of the SUV began shooting at Daniel and Scott.

{5} Scott ducked down and called 911 from his cell phone. Over the next fourteen minutes, he stayed on the line with the 911 operator while the occupants of the SUV continued to follow and shoot at them. Daniel told Scott that "Boxer" was after him. Scott tried to direct Daniel to drive in the middle of the road to prevent the SUV from overtaking the car, but he was unsuccessful. The SUV pulled up alongside the Buick and Daniel was shot in the head, causing the car to veer off the road.

{6}     The assailants continued to shoot at Scott as he jumped out of the car and sought shelter in a nearby house. The assailants circled back to the Buick and "started shooting up the whole car" with Daniel still in it, using "all kind of rounds, a lot of rounds . . . like a war," as Scott later testified, "with somebody that didn't even have a gun." When the assailants left, Scott got into the driver's seat and drove Daniel in the bullet-riddled Buick back to their mother's house.

{7}     Daniel would later die of his injuries.

**B.     The Nonstandard Eyewitness Identification Procedure**

{8}     The first law enforcement officer to arrive on scene was Sergeant Joseph Rowland of the Valencia County Sheriff's Office. No suspects had been identified at that time, but Scott told Sergeant Rowland that "Boxer" shot Daniel. Other family members thought Jesús Kime and Steven Benavidez could have been responsible because of certain Facebook postings.

{9}     Sergeant Rowland heard over the radio that Codefendants had been apprehended while hiding in an irrigation ditch after apparently abandoning an SUV. At the same time, Sergeant Rowland also learned that Steven Benavidez, another potential suspect, had been shot near one of the crime scenes. In order to determine which of the two sets of suspects were the shooters—Defendant Garcia and Defendant Montelongo-Murillo, or Jesús Kime and Steven Benavidez—Sergeant

Rowland decided to search through the database of driver's license photographs to show Scott all four of the suspects. Sergeant Rowland could not find a driver's license photograph of Steven Benavidez, but he obtained photographs of Codefendants and Jesús Kime. Sergeant Rowland did not record the identification interview with Scott.

{10} According to Scott, Sergeant Rowland displayed photographs of Codefendants, which were arranged side-by-side on the screen of Sergeant Rowland's cell phone. Scott stated, "That's the guys." Sergeant Rowland asked Scott, "Is this them?" Scott confirmed, "That's them."

{11} Sergeant Rowland described the identification procedure differently. According to Sergeant Rowland, he took out his laptop and showed Scott the three photographs sequentially, asking Scott "if any one of them were 'Boxer.'" The first photograph shown to Scott was of Defendant Garcia. Scott positively identified Defendant Garcia as "Boxer," and he "identified somewhat" Defendant Montelongo-Murillo "as possibly being the second person in the vehicle that was shooting at him and his brother." Scott did not recognize Jesús Kime. Scott was not shown a photograph of Steven Benavidez.

4

## C.    Eyewitness Lorenzo Montaño

{12}    Along the route of the drive-by shooting, Lorenzo Montaño was at home having a barbecue with two or three other men when he heard gunshots. He told the children who were playing in the yard to go inside. He then saw a brown SUV chasing a white sedan. He recognized the man hanging out of the passenger side of the SUV, shooting at the sedan, as Steven Benavidez.

{13}    Shortly after Montaño witnessed the shooting, Steven Benavidez and his girlfriend broke into Montaño's home, armed with a knife, and demanded money from Montaño. Montaño shot Benavidez and his girlfriend, injuring them nonfatally.[1] Montaño told Benavidez, "You killed Daniel Sandoval," the victim in the drive-by shooting.

{14}    That day, Detective Bert Lopez of the Valencia County Sheriff's Office interviewed Montaño about what he had seen. Montaño reported that the other people with him at the barbecue also recognized the shooter as Steven Benavidez, and he gave police the name of at least one of the other witnesses. Detective Lopez

---

[1]The State never charged Montaño for the shooting of Steven Benavidez.

5

made an audio/video recording of his interview of Montaño, which the State would later provide to the defense as part of discovery.

{15}    Detective Lopez later served Steven Benavidez with a warrant while he was in jail on other charges. After interrogating Steven Benavidez, Detective Lopez determined that he was not involved in the drive-by shooting and the warrant was dismissed. Detective Lopez also investigated the other suspect named by the victim's family, Jesús "Killer" Kime, and determined that he was not a person of interest either. Detective Lopez did not explain his reasons for dropping the investigation into these alternate suspects other than to state that Scott did not know who they were, and "the brunt of the force was pushing against" them.

**D.    Pretrial Proceedings and the Motion to Exclude Montaño**

{16}    On April 4, 2019, a grand jury indicted Codefendants for first-degree murder and related charges stemming from the drive-by shooting. A few weeks later, before Codefendants had been arraigned, the State filed a witness list that included eyewitness Montaño. Apparently like the other lay witnesses, the State gave Montaño's address as "c/o District Attorney's Office" in Belen. During the pretrial period, the State followed up with seven amended witness lists, all of which included Montaño, and all of which gave his address as the district attorney's office.

{17} On May 3, 2022, Codefendants filed a joint notice of intent to call witnesses, which listed a single named expert witness followed by, in all caps and underlined, "ANY WITNESS CALLED, REVEALED, OR DISCLOSED BY THE STATE." Trial was set for October 31, 2022 through November 16, 2022.

{18} On the morning of October 26, 2022, one of the defense attorneys emailed the prosecutor a subpoena for Montaño to appear at trial. The prosecutor informed the defense attorney that the State would not be calling Montaño at trial, and the defense attorney responded that, in that case, he would personally attempt to serve Montaño with the subpoena. That afternoon, the defense attorney had Montaño served and filed the return of service with the district court.

{19} That same afternoon, the prosecutor filed a Motion to Exclude Lorenzo Montaño or in the Alternative to Compel a Pretrial Interview. Although the State admitted that Montaño was on the State's witness list and his address was listed as care of the district attorney's office, the prosecutor stated that "Montaño has never provided a pretrial interview" and "the [S]tate has not had contact with . . . Montaño since the inception of this case." Despite having provided the defense with the audio recording of Detective Lopez's interview of Montaño, the prosecutor alleged that "[t]he [S]tate has never spoken to" Montaño and "is uncertain what if any substantive value his potential testimony may provide at trial." Although the prosecutor had a

7

physical address for Montaño, she asserted that "the [S]tate has never independently confirmed this address and is unaware if [Montaño] still maintains a residence at this address."

{20}     The prosecutor argued that under Rule 5-502(A)(3), Codefendants had a duty to identify any defense witnesses by name and address within thirty days after arraignment, and the defense witness list incorporating the State's witnesses by reference "does not comport with the [R]ule" and "does not put the [S]tate on notice of witnesses that the defense is going to use in their case in chief." The purpose of Rule 5-502(A)(3), the prosecutor argued, was to "prevent[] defense counsel from surprising the [S]tate at trial with witnesses that the [S]tate was unaware the defense intended on calling at trial." Without further argument, the prosecutor asked the district court to exclude Montaño as a defense witness, or, in the alternative, "to compel defense counsel to have him participate in a pretrial interview and to further order that it is the defense counsel's responsibility to subpoena this witness . . . for trial."

{21}     Codefendants filed a response to the State's motion to exclude Montaño, in which they argued that "[t]he State was already on notice where to find or contact Mr. Montaño. The defense had no other contact information than what was already provided" by the State. Codefendants argued that the State was not "surprised" by

8

Montaño because he was their own witness, whom they had already interviewed, and it would be unreasonable to require the defense to retype the names and addresses of all of the State's witnesses. Codefendants pointed out that Montaño had now been served by both parties, and the parties had scheduled a cooperative pretrial interview with Montaño at the district attorney's office.

**E.      The Hearing on the Motion to Exclude Montaño as a Defense Witness**

{22}      On November 1, 2022, the second day of voir dire, the district court heard argument on the State's motion to exclude Montaño. The State acknowledged that it had interviewed Montaño the previous Friday, but nevertheless sought to exclude Montaño as a witness because the defense had not provided adequate notice of its intention to call him. The prosecutor argued that "to allow the introduction of this witness at trial is the functional equivalent of trial by ambush." Specifically, the prosecutor argued that "the State just hasn't had an opportunity, given the timing of [Montaño's] pretrial interview, to research the other individuals that were part of the barbecue and see if they, in fact, corroborate his recollection of events."

{23}      The prosecutor claimed that "the prejudice to the State, if it can be evaluated as such, is simply that there were other [people] at that residence at the time that the witness says that he saw" Steven Benavidez and the State had not interviewed those people. The prosecutor admitted, "I am aware of what [Montaño] would likely say,"

9

but explained that "in terms of rebuttal, Your Honor, I don't even believe that we're going to be able to interview people that might have information that contradicts what Lorenzo Montaño is saying. And for that reason, the State is moving for his exclusion of witnesses."

{24}   The defense argued that there was no surprise because Montaño was the State's witness, and the defense only knew of his existence because of the recorded interview provided to the defense by the State. Moreover, the defense argued that Montaño was "a critical witness for the defense" because "he is exculpatory" in that he would testify that he saw another person commit the crime.

{25}   The district court asked the defense, "if he's such a critical witness . . . why did you wait until just before trial to identify him as a witness you intended to call?" The district court noted that Rule 5-502 "is clear" and "requires a list of names, addresses, and witnesses the defense intends to call."

{26}   The defense answered that the practice of reserving the right to call an opposing party's witnesses is quite typical and argued that it would be "somewhat redundant" to list the names and addresses of the State's forty listed witnesses. The defense added that the police interview with Montaño was conducted by the case agent, Detective Lopez, who would be seated at counsel table, and that nothing had substantively changed in Montaño's testimony from that original statement to the

pretrial interview. Defense counsel argued that the State had not shown how it would be prejudiced by the defense calling Montaño under these circumstances, pointing out that it was unlike a situation where "we found a witness who was hiding out in California and suddenly brought him into New Mexico . . . the week before the trial begins and they learn about this for the first time." Instead, the defense argued, "they knew about this man," including "what he was saying . . . that he was available . . . the address for him . . . where he could be found, where he could be served with a subpoena."

{27} The prosecutor responded that "the State is aware of what Lorenzo Montaño would or may testify to," but "the disclaimer to not follow the Rule [5-502] can't be that I knew or the State's attorneys knew about this." Instead, the prosecutor argued, Rule 5-502(A) requires that the defense "put us on notice" of "who they intend to call" within thirty days after arraignment. The prosecutor asserted that "the pretrial interview does not cure" the prejudice, which was "that there were multiple individuals at this party who had witnessed presumptively the same thing . . . and we don't have the capability of folks that aren't named in discovery to follow up with them."

{28} The district court ruled that Rule 5-502(A)'s requirement that the defendant disclose a witness list to the State within thirty days after arraignment was

controlling. The district court judge admonished the defense, stating, "[t]he defense had access to the same information that the State did with regard to this particular witness" and "had opportunity to specifically put the State on notice that they intended to call him as a witness. Merely saying that 'We reserve the right to call any witness that the State may call,' is not the same thing as disclosing witnesses you intend to call." The district court found "that it is prejudicial to the State to wait until this point to identify a witness" and "[i]f he's that critical, he should have been identified" to give the State the "opportunity to determine whether there are witnesses who have information that either is consistent with or contrary to what the information is being provided by that witness." Therefore, the district court excluded Montaño's testimony.

**F.      Trial**

{29}    Codefendants were tried jointly in a nine-day trial. The jury found Codefendants guilty of first-degree murder (willful and deliberate), conspiracy to commit first-degree murder, and attempted first-degree murder. The district court sentenced each Codefendant to forty-eight years in prison.

**II.     DISCUSSION**

{30}    We first discuss how the district court's decision to exclude Montaño was reversible error and our reasons for granting the remedy of reversal for new trial to

Codefendants despite the deficiencies in Defendant Montelongo-Murillo's briefing. We next discuss the admissibility of Scott's eyewitness identification of Codefendants under our precedent in *Martinez* and hold that, although the eyewitness identification procedure was suggestive, the district court correctly held that the eyewitness identifications were admissible because of the ongoing public safety emergency at the time. Finally, we review the sufficiency of the evidence and determine that substantial evidence supported the convictions, therefore retrial is warranted on all charges.

**A.    The Exclusion of Eyewitness Montaño Was Reversible Error**

{31}    The district court abused its discretion in excluding Montaño in two ways. First, it abused its discretion by determining that Codefendants had violated Rule 5-502(A)(3) by reserving the right to call any of the State's witnesses instead of retyping the names of the State's witnesses on their witness list. We hold that Codefendants did not violate Rule 5-502. Instead, the practice of reserving the right to call an opposing party's witnesses satisfies the purposes of the Rule, and we hold that neither the State nor the defense is required to retype the names and addresses of an opposing party's witnesses onto their witness list under Rule 5-501 NMRA or Rule 5-502.

**{32}** Second, even if Codefendants had violated a rule, the district court abused its discretion by failing to analyze the propriety of witness exclusion under the standard set out in *McCarty v. State*, 1988-NMSC-079, ¶¶ 9-10, 107 N.M. 651, 763 P.2d 360, which clearly establishes that exclusion of a defense witness in a criminal prosecution is an extreme sanction of last resort. In the case of defense witnesses, a presumption of admissibility of the testimony applies, and the sanction of witness exclusion should only be used in the most egregious circumstances. No such circumstances were presented here, where the defense merely attempted to call one of the State's own witnesses.

**1.     Standard of review**

**{33}** A district court's decision to exclude a witness is reviewed for abuse of discretion. *State v. Le Mier*, 2017-NMSC-017, ¶ 22, 394 P.3d 959 (reviewing for abuse of discretion the district court's exclusion of a state's witness for the prosecution's failure to comply with discovery disclosure orders); *McCarty*, 1988-NMSC-079, ¶ 17 (reviewing for abuse of discretion the district court's exclusion of a defense witness for failure to comply with alibi notice deadlines). "A court abuses its discretion when its ruling is clearly against the logic and effect of the facts and circumstances of the case." *State v. Harper*, 2011-NMSC-044, ¶ 16, 150 N.M. 745, 266 P.3d 25 (internal quotation marks and citation omitted). "Trial courts possess

broad discretionary authority to decide what sanction to impose when a discovery order is violated." *Le Mier*, 2017-NMSC-017, ¶ 22. And "[i]t is clear that a trial court does have the discretion to preclude defense testimony as a sanction for failure to comply" with court rules. *McCarty*, 1988-NMSC-079, ¶ 15 (citation omitted).

{34} "Preclusion, however, constitutes a conscious mandatory distortion of the fact-finding process whenever applied. Before a defendant's sixth amendment rights are derogated as a sanction for noncompliance, a trial judge must exercise his discretion within recognized parameters." *Id.* (citation omitted). In every case, but particularly in the case of exclusion of a defense witness, the "trial court should seek to apply sanctions that affect the evidence at trial and the merits of the case as little as possible." *Harper*, 2011-NMSC-044, ¶ 16 (text only)[2] (citation omitted).

**2.      The defense did not violate Rule 5-502 and the district court had no basis to impose any sanction on Codefendants**

{35}    The district court excluded Montaño on the sole ground that the defense witness list violated Rule 5-502(A)(3) because it purported to reserve a general right to call any of the State's witnesses rather than individually listing the "names and addresses of the witnesses the defendant intends to call at the trial." *Id.* Based solely

---

[2]"(Text only)" indicates the omission of nonessential punctuation marks—including internal quotation marks, ellipses, and brackets—that are present in the text of the quoted source, leaving the quoted text otherwise unchanged.

on its plain text, the district court interpreted Rule 5-502(A)(3) to prohibit the defense from calling a State's witness unless the defendant specifically retyped the name and address from the State's witness list into Defendant's witness list. We hold that our witness disclosure rules, Rule 5-501 and Rule 5-502, require no such redundancy.

{36} On the contrary, our witness disclosure rules, like all discovery rules, are liberally construed to effectuate their underlying purpose. *See Santa Fe Pac. Gold Corp. v. United Nuclear Corp.*, 2007-NMCA-133, ¶ 13, 143 N.M. 215, 175 P.3d 309 (citing *Carter v. Burn Constr. Co., Inc.*, 1973-NMCA-156, ¶ 10, 85 N.M. 27, 508 P.2d 1324) ("[D]iscovery rules are liberally construed to enable parties to easily obtain the relevant facts before trial."). "The purpose of discovery in a criminal case, indeed the purpose of a trial itself, is to ascertain the truth." *State v. Manus*, 1979-NMSC-035, ¶ 36, 93 N.M. 95, 597 P.2d 280, *overruled on other grounds by Sells v. State*, 1982-NMSC-125, ¶ 9, 98 N.M. 786, 653 P.2d 162. The purpose of the witness disclosure rules is to allow for witness interviews and thereby to facilitate case preparation. *See Le Mier*, 2017-NMSC-017, ¶ 23 (discussing witness disclosure rules).

{37} The district court's narrow reading of Rule 5-502(A)(3) would effectively invalidate any clause on a witness list reserving the right to call an opposing party's

16

witnesses. But the purpose of the witness disclosure rule—to facilitate interviews—has already been met with regard to a party's own witnesses. As a matter of common sense, a party has already interviewed its own witnesses before including them on a witness list; if not, the party would have no basis to believe that the witness would have any relevant information for the trial. Requiring counsel to retype the names and addresses of opposing counsel's witnesses onto the defense's witness list would not add to the truth-seeking purpose of discovery but would only add needless administrative burden to all parties.

{38}   In sum, a party provides adequate notice of intent to call an opposing party's witnesses by including a general statement reserving the right to call the opposing party's witnesses. Neither Rule 5-501 nor Rule 5-502 require any additional form of notice. Codefendants' witness list that included a general statement reserving the right to call the State's witnesses provided adequate notice to the State of its intent to call Montaño, the State's witness. In that way, Codefendants' witness list satisfied the underlying purpose of Rule 5-502; and, the district court abused its discretion when it found that the defense violated Rule 5-502. *See State v. Orona*, 179-NMSC-011, ¶ 6 ("The purpose of requiring the state to provide the defendant a witness list is to assist defense counsel in the preparation of a defense by providing the opportunity to interview the government's witnesses."); *State v. Ferry*, 2018-

17

NMSC-004, ¶ 2, 409 P.3d 918 (holding that an abuse of discretion occurs, inter alia, when the district court fails to correctly apply legal principles that lead to only one correct outcome).

**3.** **Under the *McCarty* standard for exclusion of defense witnesses, the district court abused its discretion by imposing the extreme sanction of witness exclusion**

{39} In this case, the defense did not violate Rule 5-502. But even if it had, the district court erred when it failed to analyze whether the defense witness should be excluded under the factors articulated in *McCarty*, 1988-NMSC-079, ¶¶ 9-10. Therefore, we find it prudent to provide guidance on this standard that should be applied whenever the state seeks to exclude a witness for the defense in criminal matters.

{40} As a general rule, "[t]he exclusion of witnesses is a severe sanction that raises questions about the fairness of the judicial process," and where exclusion of a witness prevents a party from making its prima facie case, the sanction "should not be imposed except in extreme cases, and only after an adequate hearing to determine the reasons for the violation and the prejudicial effect on the opposing party." *Harper*, 2011-NMSC-044, ¶ 21 (citations omitted); *accord, e.g., Le Mier*, 2017-NMSC-017, ¶ 21 ("When exercising their discretionary power, our courts must be ever mindful of the fact that witness exclusion is a severe sanction and one that

18

should be utilized as a sanction of last resort."). This strong policy preference in favor of the admission of witness testimony—articulated in *Harper* and *Le Mier* in the context of exclusion of a state's witness—comes into starker relief when the witness will be called by the defense and requires consideration of matters beyond those set out in these two cases.

{41} The exclusion of a defense witness may deprive a defendant of his or her constitutional right to present a defense as guaranteed by the compulsory process clause of the Sixth Amendment and the due process clause of the Fourteenth Amendment of the United States Constitution. *See, e.g.*, *Taylor v. Illinois*, 484 U.S. 400, 408-09 (1988) ("The [defendant's] right to offer testimony is . . . grounded in the Sixth Amendment."); *see also Washington v. Texas*, 388 U.S. 14, 19 (1967) ("The right to offer the testimony of witnesses . . . is in plain terms the right to present a defense, . . . This right is a fundamental element of due process of law."). Likewise, under certain circumstances, the exclusion of a defense witness may violate Article II, Section 14 of the New Mexico Constitution, which provides every accused with "the right . . . to have compulsory process to compel the attendance of necessary witnesses in his behalf."

{42} Although these rights are not absolute, this Court has long recognized that when a court rule conflicts with a defendant's right to present a defense, we presume

that the court rule must yield. *See McCarty*, 1988-NMSC-079, ¶ 9 (discussing with approval the holding in *Fendler v. Goldsmith*, 728 F.2d 1181, 1188 (9th Cir. 1983), that the Sixth Amendment does require a presumption that defense witnesses be permitted to testify); *but see Taylor*, 484 U.S. at 410, 414-15 (holding that the Sixth Amendment does not pose an absolute bar to the exclusion of defense witnesses). In *McCarty*, this Court held that the district court abused its discretion in precluding alibi testimony proffered by the defense, even though the defense failed to file a timely notice of alibi as required by Rule 5-508 NMRA. *McCarty*, 1988-NMSC-079, ¶ 17. The *McCarty* Court recognized that the district court's discretion to exclude defense witnesses must take into account "the fundamental character of the defendant's right to offer the testimony of witnesses in his favor." *Id.* ¶ 7. Therefore, "preclusion" of a defense witness "is only appropriate in limited circumstances." *Id.*

{43}    *McCarty* adopted a balancing test for the exclusion of a defense witness as established in *Fendler*, 728 F.2d at 1188, and cited in *Taylor*, 484 U.S. at 415 n.19. The balancing test explicitly incorporates a presumption against exclusion, explaining, "'[a]t the outset we emphasize that for a balancing test to meet Sixth Amendment standards, it must begin with a presumption against exclusion of otherwise admissible defense evidence. No other approach adequately protects the right to present a defense.'" *McCarty*, 1988-NMSC-079, ¶ 9 (quoting *Fendler*, 728

20

F.2d at 1188). The district court in this case did not consider, much less apply, this mandatory presumption to the admission of Montaño's testimony.

{44} After applying the presumption, *McCarty* then requires the district court to balance: "(1) the effectiveness of less severe sanctions, (2) the impact of preclusion on the evidence at trial and the outcome of the case, (3) the extent of prosecutorial surprise or prejudice, and (4) whether the violation was willful." 1988-NMSC-079, ¶ 10. We conclude that three of these factors are substantially equivalent to the *Harper* factors—which apply to all parties, not just criminal defendants—in that the district court must consider intentionality, prejudice, and less severe sanctions. *See Harper*, 2011-NMSC-044, ¶ 2 (holding that "exclusion of witnesses requires" (1) "an intentional violation of a court order," (2) "prejudice to the opposing party, and" (3) "consideration of less severe sanctions"). However, when contemplating the exclusion of a defense witness, the *McCarty* test adds the gloss that district courts "should balance the potential for prejudice to the prosecution against the impact on the defense and whether the evidence might have been material to the outcome of the trial." 1988-NMSC-079, ¶ 10 (citation omitted). The district court did not conduct any part of this balancing test. When the *McCarty* balancing test is applied to Montaño's testimony, the presumption against exclusion cannot be overcome.

21

{45} First, the district court moved immediately to the most extreme sanction of witness exclusion without considering lesser sanctions. Even though the State had originally sought two remedies—exclusion of the witness or a pretrial interview—the district court did not explore whether the State, having obtained the alternative relief it sought, was now without prejudice. Moreover, the district court did not explore any other remedies such as resetting trial. Unlike in *Le Mier* where the district court "gave the [s]tate multiple and varying opportunities to cure its discovery violations and imposed exclusion only after progressive sanctions failed to produce the desired effect," the district court in this case did not give defense counsel any means by which counsel could cure any perceived problem with the witness. 2017-NMSC-017, ¶ 28. Instead, it moved immediately to the harshest sanction available: exclusion.

{46} Second, the impact of exclusion on the defense was devastating. As Defendant Garcia argues, without Montaño's testimony, the defense was unable to put forth affirmative exculpatory testimony. Therefore, Codefendants were unable to present their prima facie defense theory to the jury: namely, that someone else—Steven Benavidez—was responsible for the crimes of which they were accused. And like in *McCarty*, Montaño's "precluded testimony was critical to the defense's ability to

22

impeach the credibility of the State's key witness"—Scott Sandoval. 1988-NMSC-079, ¶ 17.

{47} Third, the prosecution would have been neither surprised nor prejudiced by the admission of Montaño's testimony. Certainly, the State cannot claim surprise as to the testimony of its own witness, particularly when the prosecutor readily admitted that she had interviewed Montaño and was therefore "aware of what [Montaño] would likely say." As to prejudice, the State asserted that it was prejudiced for one reason alone: other people who were at home with Montaño at the time of the event also witnessed what happened, and the State had not interviewed *them*. The district court agreed that the State should have been given "an opportunity to determine whether there are witnesses who have information that either is consistent with or contrary to" Montaño's anticipated testimony.

{48} But the defense did not deprive the State of its opportunity to interview these witnesses. The State was first made aware of their existence through its initial interview with Montaño on or about the date of the crime. If the State did not interview them, that was its own investigative choice. Nothing requires the police to follow up on every investigative lead in a case. *State v. Ware*, 1994-NMSC-091, ¶ 16, 118 N.M. 319, 881 P.2d 679 ("[T]he failure to gather evidence is not the same as the failure to preserve evidence, and . . . the [s]tate generally has no duty to collect

particular evidence."). Police may have had good reason for not interviewing those people. But the key fact is that the direction of the investigation was determined by the State, not defense. The defense did not conceal the existence of those witnesses or otherwise withhold evidence from the State. Therefore, the defense did not "prejudice" the State. *See Harper*, 2011-NMSC-044, ¶ 19 ("'[T]he concept of 'prejudice' in this context is limited to an adverse impact upon the defense's ability to prepare and present its case.'" (quoting 5 Wayne R. LaFave, et al., *Criminal Procedure* § 20.6(b), at 495-96 (3d ed. 2010)). The State was able to prepare and present its case; that it chose not to follow up on certain eyewitness interviews does not mean that it would be prejudiced by testimony from one eyewitness whom it had interviewed.

{49}     Lastly, the defense did not act with the requisite culpability. Even if the district court were correct that the defense violated Rule 5-502—which it did not—we stress that violation of a discovery rule is generally not equivalent to the "intentional violation of a court order" that was a prerequisite to witness exclusion in *Harper*, 2011-NMSC-044, ¶ 2, and, without more, is not tantamount to the willful violation that is discussed in the *McCarty* balancing test, 1988-NMSC-079, ¶ 10.

{50}     In *Le Mier*, this Court characterized the district court's ruling as being "appropriately lenient" after the state violated Rule 5-501, the discovery rule

24

requiring the state to provide witness addresses. *Le Mier*, 2017-NMSC-017, ¶ 23. It was only after the state subsequently violated two written court orders and multiple oral ones, accepting "progressive sanctions" along the way, that the district court ultimately imposed the extreme sanction of witness exclusion. *Id.* ¶ 28. This distinction indicates that a mere rule violation, without more, is not as culpable as "an intentional violation of a court order," *Harper*, 2011-NMSC-044, ¶ 2, and should not result in witness exclusion. Instead, absent evidence of culpable conduct, leniency is appropriate for a mere rule violation. *Le Mier*, 2017-NMSC-017, ¶ 23; *see also State v. Quintana*, 1974-NMCA-095, ¶ 8, 86 N.M. 666, 526 P.2d 808 (failing to comply with the witness disclosure rule did not result in exclusion); *Manus*, 1979-NMSC-035, ¶¶ 40-42 (same).

{51}    The district court judge made no finding that the defense acted willfully, and the record contains no grounds for such a finding. *Compare, e.g.*, *State v. Stills*, 1998-NMSC-009, ¶ 43, 125 N.M. 66, 957 P.2d 51 (affirming the district court's exclusion of a defense witness based on the judge's finding that "defense counsel was engaging in delay tactics, that preclusion was necessary to protect the integrity of the judicial system, and efficient administration of justice"). Instead in this case, the record reflects that defense counsel followed standard practice in reserving the right to call a State's witness, and then fully cooperated in procuring that witness for

the prosecution to interview prior to trial when the prosecutor decided against calling the witness on behalf of the State.

{52} In sum, before the district court excludes a witness for the defense in a criminal proceeding, it must first apply the presumption against exclusion recognized by *McCarty* and then apply the *McCarty* balancing test, considering the three factors set out in *Harper* and affirmed in *Le Mier*—(1) effectiveness of less severe sanctions; (2) the extent of surprise or prejudice to the prosecution; (3) whether the violation was willful—as well as the additional, fourth factor identified by the *McCarty* Court: (4) the impact of preclusion on the evidence at trial and the outcome of the case. In this case, the district court did not consider and apply *McCarty*'s test for the exclusion of defense witnesses. It did not apply the mandatory presumption against the exclusion of Montaño's testimony. It did not consider other sanctions, properly assess prejudice, or determine that the defense acted with the requisite culpability, as also required by *Harper*. And, finally, it did not consider the impact of exclusion on the defense's case. As Defendant Garcia persuasively argues, there is little doubt that Montaño's testimony was crucial to the defense because he was an eyewitness to the homicide at issue and he would testify that someone else— a plausible alternate suspect—committed the crime. This evidence is quintessential exculpatory evidence that, if believed, could completely change the outcome of trial.

{**53**}    Here, like in *McCarty*, we conclude that "under the facts and circumstances of this case it would be unreasonable to weigh the balance against the defendant." 1988-NMSC-079, ¶ 17. Therefore, even if the defense had violated Rule 5-502, the district court would have abused its discretion by excluding Montaño as a defense witness. *See Harper*, 2011-NMSC-044, ¶ 16 ("A court abuses its discretion when its ruling is clearly against the logic and effect of the facts and circumstances of the case." (internal quotation marks and citation omitted)).

**4.    The remedy**

{**54**}    The remedy for the erroneous exclusion of a defense witness is reversal and remand. *See, e.g.*, *McCarty*, 1988-NMSC-079, ¶ 18 (reversing the district court's ruling excluding defense witnesses and remanding for a new trial); *cf. Harper*, 2011-NMSC-044, ¶ 28 (reversing and remanding after holding that the district court abused its discretion by excluding the state's witnesses).

{**55**}    We note that, on appeal, only Defendant Garcia properly raised the dispositive issue of witness exclusion. In contrast, Defendant Montelongo-Murillo omitted any discussion of this issue except in a footnote that purported to incorporate Defendant Garcia's brief by reference. Defendant Montelongo-Murillo's footnote does not meet the briefing standards required by our appellate rules. *See* Rule 12-318(A)(4) NMRA (requiring each issue in a brief in chief to include a discussion of the

"standard of review, the contentions of the appellant, and [preservation] . . . , with citations to authorities, record proper, transcript of proceedings, or exhibits relied on. Applicable New Mexico decisions shall be cited"); Rule 12-317 NMRA (setting forth requirements for joinder or consolidation of appeals). We will generally not reach any issue raised in this manner, and we admonish counsel not to follow this practice in the future. *See State v. Aragon*, 1990-NMCA-001, ¶ 4, 109 N.M. 632, 788 P.2d 932 (rejecting arguments by reference to extrinsic documents so as to avoid forcing parties and the Court to search the record and pleadings, to speculate as to the issues on appeal, and to prevent parties from sidestepping page limits); *United Nuclear Corp. v. State ex rel. Martinez*, 1994-NMCA-031, ¶ 5, 117 N.M. 232, 870 P.2d 1390 (declining to review arguments that a party sought to incorporate by reference and noting, "[t]his is an unacceptable briefing practice, and we will not reexamine these other pleadings in this appeal").

{56} However, "[f]ew rights are more fundamental than that of an accused to present witnesses in his own defense." *Chambers v. Mississippi*, 410 U.S. 284, 302 (1973). In denying Codefendants the right to present the testimony of an exculpatory witness, the district court infringed on the fundamental rights of both Defendant Garcia and Defendant Montelongo-Murillo, who were tried jointly. Under these circumstances, this Court has the equitable power to provide a remedy to both

28

Codefendants despite the deficiencies in Defendant Montelongo-Murillo's briefing. *See State v. Cruz*, 2021-NMSC-015, ¶¶ 29-30, 486 P.3d 1 (exercising discretion to reach an issue affecting the defendant's fundamental rights, even though counsel had not raised the issue); *see also* Rule 12-321(B)(2)(d) NMRA (permitting "the appellate court, in its discretion" to reach "issues involving . . . fundamental rights of a party" even when the issue is not properly preserved). Accordingly, we exercise our discretion to reverse and remand both of these consolidated cases.

**B.** *Martinez* **Does Not Require the Suppression of Scott Sandoval's Eyewitness Identification of Codefendants**

{57} Codefendants filed a joint motion to suppress the eyewitness identifications that Scott made to Sergeant Rowland in the immediate aftermath of the crime, arguing that the nonstandard identification procedure that Sergeant Rowland used was so highly suggestive that the admission of the evidence would violate due process under *Martinez*. The district court denied the motion, finding that "[a] state of emergency existed in the Meadowlake District" during the time of Scott's identifications, the suspects "were at large, armed and dangerous, and present in the Meadowlake area," and "additional 911 calls were placed in reference to another shooting nearby wherein two individuals had been shot, . . . and Sergeant Rowland did not know if these shootings were connected." Given those facts, the district court concluded that the identification procedure did not violate Codefendants' due

29

process rights under *Martinez*, "because there was a sufficient law enforcement justification" for the procedure.

{58} On appeal, Codefendants challenge that ruling on the same grounds asserted below. For the following reasons, we affirm.

**1.     Legal standards**

**a.     Standard of review**

{59} This Court reviews the denial of a motion to suppress an eyewitness identification "as a mixed question of fact and law, with the Court viewing the facts in the manner most favorable to the prevailing party, and drawing all reasonable inferences in support of the court's decision." *Martinez*, 2021-NMSC-002, ¶ 25 (text only) (citation omitted). The application of law to those facts is then subject to a de novo standard of review. *Id.* Finally, we review for harmless error if any error is discovered. *Id.* ¶ 79.

**b.     The *Martinez* test**

{60} In *Martinez*, we adopted a per se rule of exclusion for unnecessarily suggestive eyewitness identification procedures used by police. *Id.* Under *Martinez*, "if a witness makes an identification of a defendant as a result of a police identification procedure that is unnecessarily suggestive and conducive to irreparable misidentification, the identification and any subsequent identification by

the same witness must be suppressed." *Id.* We made clear that determining whether an identification procedure was "*unnecessarily* suggestive" involves an inquiry into "whether the police have a *good reason* to use a suggestive identification procedure in the first instance." *Id.*

{61} Thus, the *Martinez* test for the admissibility of an eyewitness identification proceeds in two parts. First, the defendant has the burden "to establish prima facie that some aspect of the identification procedure employed by the police was suggestive." 2021-NMSC-002, ¶ 80. If the defendant meets that burden, "the burden shifts to the state to prove by clear and convincing evidence *either* that (1) the procedure employed was not so suggestive as to materially taint the identification . . . *or* (2) good reason existed for the police to employ the suggestive procedure in the first instance." *Id.* This latter element—that "good reason existed for the police to employ the suggestive procedure"—was the basis of the district court's ruling in this case. *Id.*

{62} The "good reason" standard articulated in *Martinez* is one that we adopted from Massachusetts, which has a well-developed body of law construing that term. *See id.* ¶ 79 (stating that "[t]his rule in part mirrors the Massachusetts approach," and citing *Commonwealth v. Johnson*, 45 N.E.3d 83, 88 (Mass. 2016)). Therefore, Massachusetts law informs the applicable standard for good reason in New Mexico.

31

Massachusetts courts assess good reason by examining, essentially, police necessity. Specifically, the Massachusetts standard examines:

> 'the nature of the crime involved and corresponding concerns for public safety; the need for efficient police investigation in the immediate aftermath of a crime; and the usefulness of prompt confirmation of the accuracy of investigatory information, which, if in error, will release the police quickly to follow another track.'

*Johnson*, 45 N.E.3d at 88 (quoting *Commonwealth v. Austin*, 657 N.E.2d 458, 461 (Mass. 1995)).

{63}    Under this standard, the State can meet its burden to show good reason by demonstrating that a suggestive identification was conducted for a legitimate law enforcement purpose, such as protecting public safety or quickly confirming the identity of an assailant in the immediate aftermath of a crime. *See id.* If the State meets that burden, then the suggestive identification is admissible. *Martinez* only requires suppression of the identification "[i]f the state fails to carry its responsive burden." 2021-NMSC-002, ¶ 80.

**2.    Analysis**

{64}    Viewing the facts in the light most favorable to the State and "drawing all reasonable inferences in support" of the district court's ruling, *id.* ¶ 25, the district court reasonably concluded that the suggestive identification was nonetheless admissible because "good reason existed for the police to employ the suggestive

32

procedure in the first instance," *id.* ¶ 80. The good reason standard was met because of the ongoing emergency situation that existed at the time.

{65}    The evidence showed that the incident was extremely violent, of an extended duration over multiple locations, and open-ended. There was more than one suspected shooter, and these armed and dangerous men were at large in the small Meadow Lake community. Three distinct crime scenes had to be secured and the route between them investigated. Law enforcement resources were stretched beyond capacity. Dispatchers were flooded with nonstop calls all shift. Additionally, while police were still investigating Daniel's fatal shooting, they received reports that one of the potential suspects, Steven Benavidez, had been shot and was lying in the middle of the road. Callers were reporting that men were jumping fences and trying to enter houses. As Sergeant Rowland summarized, "[i]t was dangerous for everyone." That evidence provided ample support for the district court's finding that police were operating under "[a] state of emergency" at the time Sergeant Rowland conducted the suggestive identification.

{66}    The district court correctly concluded that the state of emergency provided good reason for the suggestive eyewitness identification procedure. As stated previously, the *Martinez* good reason standard can be interpreted through Massachusetts law, which examines three factors: (1) "'the nature of the crime

33

involved and corresponding concerns for public safety'"; (2) "'the need for efficient police investigation in the immediate aftermath of a crime'"; and (3) "'the usefulness of prompt confirmation of the accuracy of investigatory information, which, if in error, will release the police quickly to follow another track.'" *Johnson*, 45 N.E.3d at 88 (quoting *Austin*, 657 N.E.2d at 461). All of these factors weighed in favor of a finding of good reason in this case.

{67}     In this case, the nature of the crime was extremely violent and dangerous—murder, attempted murder, and any number of potential crimes associated with shooting from a moving vehicle in an inhabited area—and the corresponding concerns for public safety were similarly high. *Cf. Austin*, 657 N.E.2d at 461-62 (noting that because "at least one dangerous bank robber was at large, and that whoever was involved could either escape altogether or strike again with possible injury to, or loss of, human life" there was "extremely good justification" for the suggestive identification procedure). Given that police resources were overwhelmed, police had to be efficient in their investigation in the immediate aftermath of this crime. *Cf. Stovall v. Denno*, 388 U.S. 293, 301-02 (1967) (holding that a showup identification at a witness's hospital bed was justified because the witness could have exonerated defendant and "[n]o one knew how long [the witness] might live"), *abrogated by United States v. Johnson*, 457 U.S. 537, 543-44 (1982).

34

Finally, because police did not know whether the shootings were connected, confirmatory information would have been essential to resolving these incidents and restoring public safety. *See Austin*, 657 N.E.2d at 462 ("[T]he police needed to determine, as quickly as possible, whether the robberies were committed by a single individual. Based on the identification by the witnesses (or the lack thereof), the police in these communities would know whether they were dealing with one bank robber or more, and could focus their investigation accordingly.").

{68} We do not condone the suggestive eyewitness identification procedure that was used in this case. However, given the exigent circumstances, it was reasonable for the district court to conclude that law enforcement had good reason to use the suggestive identification procedure, and, therefore, the admission of evidence of the identification did not violate Codefendants' due process rights. *See generally* 16C C.J.S. *Constitutional Law* § 1677, at 340 (2015) ("[E]xigent circumstances generally will weigh in favor of concluding that a showup identification procedure . . . did not violate due process guarantees, because a showup procedure may be necessary to quickly confirm the identity of a suspect or to ensure the release of an innocent suspect."). Therefore, the district court did not err in admitting the evidence under *Martinez*.

**C.    Retrial Is Warranted Because the Convictions Were Supported By Sufficient Evidence**

{69}    "Having concluded that the error in this case mandates reversal, to avoid double jeopardy concerns, we must examine whether sufficient evidence in this case supports retrying" both Codefendants. *State v. Suazo*, 2017-NMSC-011, ¶ 32, 390 P.3d 674 (citation omitted). In conducting this review, we ask "whether substantial evidence of either a direct or circumstantial nature exists to support a verdict of guilty beyond a reasonable doubt with respect to every element essential to a conviction." *Id.* (text only) (citation omitted).

{70}    The essential elements were as follows. The jury was instructed that it could find Codefendants guilty of first-degree willful and deliberate murder if it found that they (1) killed Daniel Sandoval (2) "with the deliberate intention to take away [his] life." The jury was instructed that it could find Codefendants guilty of conspiracy to commit first-degree murder if it found that they (1) "by words or acts agreed to commit first degree murder" and (2) "intended to commit first degree murder." Finally, the jury was instructed that it could find Codefendants guilty of attempted first-degree murder if it found that they (1) "intended to commit" first-degree murder and (2) "began to do an act which constituted a substantial part of the first degree murder but failed" to complete the murder of Scott Sandoval.

{71} The evidence supporting all of these elements included evidence that Scott identified Defendant Garcia as the driver and Defendant Montelongo-Murillo as the passenger in the SUV used in the shooting; Scott was specifically targeted by the shooters after he jumped out of the car and fled on foot; Defendant Garcia had a longstanding feud with Daniel and had previously tried to kill Daniel by shooting at him from a vehicle; Codefendants were discovered together hiding in a ditch after Daniel was killed; Defendant Montelongo-Murillo's DNA and fingerprints were found in the abandoned SUV near the location that Daniel was killed; the DNA of Defendant Garcia "could not be eliminated as possible contributor[]" to items tested inside the Tahoe; and Codefendants had recently purchased the SUV together.

{72} From this evidence, a rational jury could have concluded beyond a reasonable doubt that Codefendants agreed to kill Daniel, deliberately killed Daniel, and attempted to kill Scott. Because each element of the crimes charged were supported by substantial evidence, retrial is permitted.

## III. CONCLUSION

{73} For the foregoing reasons, we reverse Codefendants' convictions and remand for a new trial. A new trial is warranted because sufficient evidence supported the convictions.

37

{74}     **IT IS SO ORDERED.**

_____
**JULIE J. VARGAS, Justice**

**WE CONCUR:**

_____
**DAVID K. THOMSON, Chief Justice**

_____
**MICHAEL E. VIGIL, Justice**

_____
**C. SHANNON BACON, Justice**

_____
**BRIANA H. ZAMORA, Justice**